## Loftus' Appeal

*John L. Kilcoyne,* for appellant.
*Martin F. Hatch,* for Liquor Control Board.

BOYER, J., July 3, 1944.—In July of 1942, the Pennsylvania Liquor Control Board granted a restaurant liquor license, with an amusement permit, to Pauline M. Loftus, the above appellant, for a restaurant located on the corner of Growder and Railroad Avenues in the Village of Trevose, Bensalem Township, Bucks County. Appellant accordingly opened and operated said establishment from that time to the date of hearing on this appeal on February 17, 1944. On September 3, 1943, the licensee filed with the Liquor Control Board an application for the transfer of the license and amusement permit to another property situated at the corner of Growder and Bound Brook Avenues in the same village, about a thousand feet distant across the railroad tracks of the main line of the Reading Company and about a third of a mile by road. On October 19 and November 9, 1943, hearings were held before the board on said application for transfer, and on January 7, 1944, the

board filed its opinion and order refusing the application on the ground of protests filed by residents in the vicinity of the proposed new location of the licensed restaurant. On January 17, 1944, the applicant for the transfer took an appeal from the decision of the board to this court.

This appeal, under the evidence taken at the hearing and the contentions of the parties, raises three main issues. The first one is a question of law, namely: Whether the Liquor Control Board or the court, on appeal, has any discretion in granting or refusing the transfer of the license where the physical equipment of the proposed new restaurant is in compliance with the law, and the applicant's personal moral character is not attacked? Second, if it has such discretion, should the transfer be granted under the facts in the case? And third, if it does not have such discretion, can it still refuse the transfer of the license on the ground that the applicant is not a person of fit moral character to be entrusted with a license?

The first question requires the consideration and construction of sections 403 and 408 of the Pennsylvania Liquor Control Act of November 29, 1933, P. L. 15, as amended. Section 403, providing for the grant of the original license, is clearly mandatory and confers no discretion upon the board as to issuing the license, except to determine the compliance of the premises with the physical requirements of the act, its location with relation to certain institutions, and the moral fitness of the applicant. The operative portion of the act, as amended by the Act of June 16, 1937, P. L. 1762, with respect to the general discretion in the grant of the original license is as follows:

". . . the board *shall*, in the case of a hotel or restaurant, *grant and issue* to the applicant *a liquor license*, and in the case of a club, may, in its discretion, issue a license: Provided, however . . .", etc. (Italics supplied.)

In section 408 of the act, as amended by the Act of July 18, 1935, P. L. 1246, providing for the transfer of a license to another person or place, the language is strikingly different, the material operative portions being as follows:

"The board *is hereby authorized* to transfer any license from one person to another, or from one place to another within the same municipality or both, *as the board may determine* . . .", etc. (Italics supplied.)

The difference in the language used in these two sections relating to practically the same subject matter, except that one is for the grant of the license and the other is for the subsequent transfer of the license, is striking and, in our opinion, significant. It seems apparent that the adoption of such utterly different language in the latter section was done advisedly. This conclusion is in accordance with all the rules of statutory construction: that it is to be assumed that the legislature meant exactly what it said; that the courts must accept, in the first instance, the ordinary meaning of the language in which the legislature chose to express its intent.

The first inquiry that arises in one's mind is, why did not the legislature express itself in section 408 as it did in section 403 and say, "The Board shall transfer any license . . . from one place to another within the same municipality", unless it intended to authorize the board to exercise its sound discretion? The very word, "authorized", implies a permissive or discretionary exercise of power. Sometimes, when used in statutes with relation to administrative acts for the general welfare of the public, it has been held to be mandatory. Thus, where a tax board was "authorized and empowered" to hear and determine claims of assessment, it was held to be mandatory: People v. Herkimer County Supervisors, 56 Barb. (N. Y.) 452. In Palmcroft Development Co. v. City of Phoenix, 46 Ariz. 200, 49 P.(2d) 626, the words were held to be peremptory when used to clothe a public officer with power to do

an act which ought to be done for the sake of justice, or which concerns the public interest. In People v. Murphy, 65 App. Div. 123, 72 N. Y. Supp. 473, it was held that where, by act of the legislature, the police department was "authorized and empowered" to grant theatrical licenses, it vested a discretionary power in the department to grant or withhold the license. The court in its opinion quoted from People v. Grant, 58 Hun. 455, 457, 12 N. Y. Supp. 879, as follows:

"The rule undoubtedly is, that where public bodies or officers are empowered to do that which the public interests require to be done, and adequate means are placed at their disposal, the proper execution of the power may be insisted upon though the statute conferring it be only permissive in its terms: Mayor v. Furze, 3 Hill, [N. Y.] 612. The word 'may' is thus construed at times to mean 'must'. But why, it may be asked, should this construction be given to the act under consideration? What public interest demands that the mayor should be required under all circumstances to accept the fee and grant the license? It seems to me that it is quite the other way. The public good clearly requires that the permissive words in question should be read in their natural and ordinary sense."

So in this case we may also ask, why should this construction of the word "authorize", which in common parlance is permissive, be construed to be mandatory? What public interest demands that the State Liquor Board should be required under all circumstances to grant a transfer of the license? It appears to us that here also it is "quite the other way". The public good clearly requires that the permissive words "authorize" and "as they may determine" should be read in their natural and ordinary sense, namely, as being permissive or discretionary.

The word "determine" has an astonishing number and variety of definitions, as will appear by any standard dictionary and in 12 Words & Phrases 325-332.

The selection of the appropriate definition of the word depends largely upon the context. In this case it is a question of construing the entire phrase "as it may determine", the nearest equivalent of which, in our opinion, is "according to its decision". One of the definitions of the word "determine", given in Webster's New International Dictionary, and the one which appears to fit the context in which the word is used in our act of assembly, is as follows: "To conclude or decide as the result of investigation, reasoning, etc." The language used in section 408, as contrasted with that used in 403, appears to us to be so clear in its intent to clothe the board with discretion as to the grant or refusal of transfers of liquor licenses as to obviate any necessity for applying rules of statutory construction.

While the meaning of the language of section 408 seems to be entirely clear, let us assume, for the sake of argument, that it is ambiguous in view of certain clearly-granted discretions in section 403. We would then be called upon to construe this section and would ordinarily refer to the well-known rules of statutory construction. However, this act, by its own terms, furnishes the key to such construction in section 3, which provides as follows:

"Interpretation of Act. — (a) This act shall be deemed an exercise of the police power of the Commonwealth for the protection of the public welfare, health, peace and morals of the people of the Commonwealth, and to prohibit forever the open saloon; and all of the provisions of this act shall be *liberally construed for the accomplishment of this purpose.*" (Italics supplied.)

Applying the above-quoted mandatory rule of construction, we are led to inquire whether a construction which would compel the Liquor Control Board merely to give a formal rubber-stamp approval to every application for a transfer without any inquiry into, or consideration of, the general merits of the case would

contribute to "the protection of the public welfare, health, peace and morals of the people", and tend "to prohibit forever the open saloon"; or whether, on the other hand, these ends would be best accomplished by an investigation of the facts and a sound conclusion reached consistent with the declared purposes of the act. The answer is too obvious to require further comment. The legislature must have intended the latter. The result is the same whether we conclude that the language of section 408 specifically gives discretionary power to the board or that section 408 is ambiguous, and that, construing it in accordance with the title and section 3, it grants an implied discretion to the board. We conclude that the board, and now the court upon appeal, has discretionary power to grant or refuse the transfer. This is not inconsistent with our decision of June 23, 1941, in the case of Appeal of Maurice Block, which was an original application for a restaurant liquor license and in no way involved a transfer of license.

The boundaries of this discretion cannot be exactly defined. They lie somewhere between the legal right of the public to purchase and consume alcoholic beverages on the one hand, and the inherent dangers and menace of the liquor traffic and its necessary regulation by law for the protection of the public on the other. It follows, therefore, that the discretion vested in the Liquor Control Board must be a sound, legal discretion to carry out the purposes of the act and not an arbitrary one.

Another approach to the interpretation of this section is the consideration of the results of the interpretation contended for by appellant. In effect it amounts to this, that the licensee has the sole, exclusive, and arbitrary right to determine whether, when, where, and how often she may transfer her establishment, so long as it remains within the municipality and without the bounds prescribed as to churches, schools, etc. If the licensee may, at her own pleasure and discretion,

transfer her establishment once, under the act, then she may do it twice or a dozen times. She may play the game of hopscotch with her license over the entire area of the municipality without any human power to prevent it. At her pleasure, she may ruin the value of real estate in as many localities as she sees fit. She may compel high-type residents to sell or vacate desirable homes because of the proximity of her saloon. It is not conceivable that the legislature intended to give any such dangerous, arbitrary, and unjust power or authority to licensees. Again, a licensee may have shown herself unfit or untrustworthy to continue at a new location. These may have been the reasons for the use of such different language in granting the power to the board as to transfers from that used with relation to the original grants of licenses.

There has been no appellate court decision on this question and the lower court decisions of the State are not in accord. In the following cases, called to our attention, the provisions of the act as to the transfer of licenses were held mandatory: Larkin's License, 35 D. & C. 684 (Phila.) ; Popp's License, 41 D. & C. 500 (Erie) ; Kalanosky's License, 48 D. & C. 449 (Luzerne) ; Leon's Appeal, 90 Pitts. L. J. 453 (Allegheny). Cases holding the contrary, namely, that the board is given a sound discretion as to grant or refusal of a transfer, are the following: Appeal of Shockowitz et al. (Q. S. of Phila., Misc. Liquor Docket, 1941, no. 806, not reported) ; Appeal of Shafron (Q. S. of Phila., Misc. Liquor Docket, 1941, no. 795, not reported) ; Brodsky's License, 44 D. & C. 227 (Phila.) ; In re Transfer of Liquor License, 46 D. & C. 93.

We have carefully examined all these cases. Three of the second group are not reported, but copies of the opinions have been furnished to us. Frankly, we do not feel that the first group of cases, holding that the power is mandatory, furnish us with much assistance, inasmuch as they are merely categorical declarations

that the provision is mandatory. Three of them do not even quote or discuss section 408 of the act, providing for transfers; but apparently base their opinions entirely on the language of section 403. None of those cases even concedes that section 408, providing for transfers, is, or might be, dubious or ambiguous in its terms or meaning so as to call for the application of the rule of construction provided in section 3 of the act. Not one of those cases refers either to the title of the act or to section 3. We are more impressed with the soundness of the reasoning in the last group of cases, particularly with the opinion of Judge Gordon in In re Transfer of Liquor License, 46 D. & C. 93. We are thoroughly in accord with the reasoning of the court in that case and reach the same conclusion in this case.

The evidence and facts on which the court will base its order herein will not require much discussion. The evidence was overwhelming in this case to the effect that from the time of the opening of this alleged restaurant by appellant it was conducted as an ordinary saloon in which the chief purpose was the sale of intoxicating beverages and to which the furnishing of food was a mere incident. Most of appellant's business was conducted in this rural residential village after normal meal hours, at night, up until 2 o'clock each morning excepting Sunday mornings. It was almost exclusively a place of entertainment and drinking. The place was conducted as and constituted a public nuisance, disturbing the neighbors for long distances around it by drunken brawls, loud talk, blaring of a juke-box, and loud singing late into the morning hours. On certain nights the services of two bartenders were required. The Commonwealth called a large number of witnesses who protested against the transfer of the license across the railroad tracks into a section of the village which was more densely populated and had homes of a more valuable type. Most of these protestants based their objections on their knowledge of, and

experience with, the manner of the operation of this so-called restaurant. These witnesses appeared to be high-type credible citizens. Applicant called an unimpressive array of witnesses, consisting of herself, her husband, who helped conduct the place, their bartender, the bartender's wife, and three personal friends who were patrons of the saloon. It is apparent that there is no great need for a restaurant in this quiet country village, and that a small restaurant depending solely, or even chiefly, upon the sale of food for its business would not prove a success. This establishment was operated under the guise of a restaurant, but was, in fact, nothing more than an "open saloon" from the beginning.

While there was no direct attack made upon the licensee's personal character on the ground of immorality, it is very apparent that she is not a fit person to be trusted with any liquor license. She permitted conduct in and about her premises which amounted to a public nuisance and permitted drunken revelers to frequent her place for long hours at night. She perpetrated a fraud on the Commonwealth by securing a restaurant license and then using it as a disguise for conducting a taproom and saloon. As a witness, she showed that she had little regard for the sanctity and binding obligation of an oath. She was untruthful, evasive, shifting, self-contradictory, and stubborn. While testifying she constantly showed fear that the truth might be elicited as to the type of establishment she operated and the manner in which it was conducted. Her testimony throughout made a very unfavorable impression upon the court as to her fitness as a proprietress of a licensed restaurant or taproom. The recent reading of her testimony has confirmed and strengthened that original impression.

It is well settled that the hearing on an appeal to the court of quarter sessions from the action of the board is de novo and "the Court may sustain the refusal of a license for different reasons from those given

by the Board or for reasons additional to those stated by the Board": Spankard's Liquor License Case, 138 Pa. Superior Ct. 251. See also Commonwealth v. Lyons, 142 Pa. Superior Ct. 54. It follows that the court may also refuse a transfer on the ground that the applicant is not morally a fit person to be entrusted with a license, and therefore "would not have been eligible to have received the license originally" as provided by section 408 of the act.

The appeal will be dismissed and the transfer refused in this case on the following facts, established by the weight of the evidence:

1. Applicant conducted the present restaurant under her license in an illegal manner so as to constitute a public nuisance.

2. Applicant did not conduct her business as a bona fide restaurant in which the furnishing of alcoholic beverages was merely an accessory to meals and food; but on the contrary conducted the restaurant deliberately, intentionally, and in effect as an "open saloon" in which the furnishing of food was a mere pretext for, and disguise of, the real purpose.

3. The conduct and operation of the restaurant in its present location has been such as to be a menace and disturbance to the public welfare, peace and morals of the people of the Commonwealth and that community.

4. The transfer is justly objected to, by reputable citizens resident in the community to which the restaurant is proposed to be transferred, on the ground of the disorderly and unlawful manner of its previous operation.

5. As the restaurant is, and has been, conducted, its transfer would be a detriment and injury to real estate values in the vicinity of its proposed new location.

6. Applicant is not a morally fit, responsible person to whom a liquor license can be safely entrusted.

*Decree*

Now, July 3, 1944, the transfer of the license is refused, the appeal is dismissed, and the order of the Liquor Control Board herein is affirmed.